Jones, Chief Judge,
delivered the opinion of the court:
On June 17, 1942, defendant entered into a contract by the terms of which it leased from the plaintiff a filling station and storage garage in Miami, Florida. The lease ended May 8, 1946, at which time the property was returned to plaintiff.
The plaintiff alleges that at the time of return there were items of necessary repair totaling $1,053.66, and that due to overloading the floor was cracked and damaged to such an extent as to require replacement, the cost of which would be $7,177. The total claim, therefore, is for the sum of $8,230.66.
The defendant admits liability for $1,053.66. In its answer it admitted liability for additional damage to the floor in the sum of $1,000. In fact, at the time of the return of the property the parties agreed on the amount of $1,053.66 for the items listed as necessary repairs aside from the floor, and in addition representatives of the defendant offered to include an additional $1,000 for repairs to the concrete floor.
Now, however, defendant contends that recovery should be limited to $1,053.66.
*295 The cracks in the floor which developed during defendant’s occupancy of the premises appeared at or near the beams in the center of the floor. One crack extended over the full length of the building. Others extended half that distance or more.
The plaintiff after consulting the architect who designed the building rejected the $1,000 offer for damage to the floor. The architect had claimed that repairs would not constitute full restoration and that replacement was necessary. Three bids were received by plaintiff for replacement. Each bid was in excess of $7,000.
At the time of the return of the property the presence of cracks indicated the possibility that moisture might enter the cracks, which would cause the floor to deteriorate further, thus preventing its lasting out the normal life of such floors.
At the time of the taking of the evidence, however, in 1954, the floor had withstood usage without further material deterioration.
In the circumstances we do not think the plaintiff is entitled to the cost of replacing the floor.
Plaintiff is entitled to the $1,000 which was originally admitted as the cost of repairing the cracks in the floor, which was the excess damage over ordinary wear and tear. In addition, the plaintiff is entitled to recover the other items agreed upon.
Judgment will be entered for plaintiff in the sum of $2,053.66.
It is so ordered.
Laeamore, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
1. On June 17, 1942, plaintiff[1] and defendant (acting through the War Department) entered into a contract of *296 lease [2] whereby plaintiff leased to defendant a filling station and storage garage in Miami Beach, Florida. Defendant occupied the premises under the lease from its date to May 8, 1946, at which time the property was returned to plaintiff.
2. (a) The petition alleges that when the property was returned to plaintiff, “* * * there were items of necessary repairs * * *”[3] totaling $1,053.66, and that “* * * as a result of the overloading of the floor by the lessee, the floor was cracked to an extent that could not have been produced by shrinkage or expansion or contraction or by reasonable and ordinary wear and tear or by damage by the elements,” and that “* * * the floor can not be restored * * * by repairs and the construction of a new floor is necessary * * *” at a minimum cost of $7,177.00. In its prayer for relief plaintiff asks judgment for $8,740.66.[4]
(b) Defendant’s answer admits liability for the “items of necessary repairs” in the sum of $1,053.66, denies that a new floor is required as a result of its use and occupancy, and asserts that “the original floor could have been repaired at a cost of approximately $1,000 * * *.” The concluding paragraph of the answer “* * * admits that the plaintiff is entitled to a judgment in the sum of $2,053.66 * * *.”[5]
3. The contract contained the following provision:
The Government shall have the right, during the existence of this lease, to make alterations, attach fixtures, and erect additions, structures, or signs, in or upon the premises hereby leased (provided such alterations, additions, structures, or signs shall not be detrimental to or inconsistent with the rights granted to other tenants on the property or in the building in which said premises are located); which fixtures, additions, or structures so placed in or upon or attached to the said premises shall be and remain the property of the Government and may be removed therefrom by the Government prior to the termination of this lease, and the Government, if required by the Lessor, shall, before the expiration of this lease or renewal thereof, restore the *297 premises to the same condition, as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances oyer which the Government has no control, excepted: Provided, however, that if the Lessor requires such restoration, the Lessor shall give written notice thereof to the Government twenty (20) days before the termination of the lease.
4. (a) There is no evidence in the record concerning alterations made, fixtures attached, or additions, structures, or signs erected by plaintiff.[6]
(b) The lease provided that the premises were “* * * to be used exclusively for * * * warehouse and other national defense requirements of the War Department.” They were so used during defendant’s occupancy. There is no evidence in the record of the extent of such use or of its precise nature.[7]
(c) At or before the termination of the lease, plaintiff gave notice to defendant requiring restoration of the premises. While it is not established by the evidence that such notice was given either in writing or 20 days before the termination of the lease, representatives of plaintiff and defendant actively negotiated concerning “necessary repairs,” and agreed upon the items (other than the floor) as to which defendant has admitted liability,[8] and defendant has made no issue of the lack of formal or timely notice.
5. Construction of the building was begun in November 1940 and completed in March 1941. The use of it as a filling *298 station and storage garage was begun by plaintiff in April 1941 and continued into June 1942, when defendant’s occupancy began.
The site of the building was land reclaimed from swamp by earth fill. In conformity with practices approved in the region, piling made of reinforced concrete had been driven into the fill to a depth sufficient to provide stability for the support of the building.
The floor (approximately 50' x 110') rested on beams which in turn were supported by the piling. It was a slab of reinforced concrete 4y2 inches thick, designed to withstand a load of 75 pounds per square foot. The slab was made by a monolithic pour of the slab and beams, with two or three construction joints between sections poured at different times.
Piling to support the beams was driven in lengthwise rows approximately ten feet apart. Forms were constructed over the piling to shape the lower part of the beams. Earth fill was then placed between the beam forms to provide a fill form for the slab itself. The reinforcement design was such that the earth fill was not expected to provide support for the slab after the concrete dried.
Reinforcing steel rods were placed lengthwise in the beam forms. Other rods were then laid crosswise, at right angles to and crossing the beams, and overlapping in the unsupported slab area. Smaller rods were next placed lengthwise of the building across the width of the floor. When the reinforcing steel had been laid and fastened in place by wire, the concrete was poured. In this manner the upper sections of the beams were made level with and became a part of the floor slab.
6. When defendant took possession of the building under the lease, in June 1942, an inspection was made and findings were recorded in a statement of condition. Among the findings were the following: that concrete driveways, aprons and sidewalks outside the building at the northeast elevation were partially cracked, stained and soiled; that the concrete drive at the same elevation was badly settled and that a crack of approximately 1% inches appeared where the drive joined the concrete apron; that settlement cracks ap *299 peared in tlie outside stucco wall of tbe south elevation at approximately the center of the building; and that the concrete floor of the automobile storage room was badly stained and soiled.
7. When defendant relinquished possession to plaintiff, in May 1946, representatives of the parties agreed upon items of necessary repairs as stated in finding 4 (c), and defendant’s representative offered to include in the settlement $1,000 as an allowance for repairs to the concrete floor. The offer was made because of cracks in the floor, which defendant’s representative thought could be repaired.
The cracks appeared on or near the beams in the center of the floor. One crack extended over the full length of the building. Others extended half that distance or more. The cracks appeared as thin, jagged lines, visible upon close inspection where the floor was not soiled, and readily noticeable where marked by oil and dirt. In some places the cracks were wide enough and deep enough to insert a small knife blade.
8. Plaintiff rejected the prof erred settlement after being advised by the architect who designed the building and by contractors engaged in that type of construction that repairs would not restore the floor to its original condition; and that such restoration would require removal of the existing floor and replacement by a new slab. Three bids were received by plaintiff quoting as prices for the removal and replacement $7,687, $7,411, and $7,177.
9. Concrete, once cracked, cannot be restored to its original condition by repairs, because of inability to restore the initial bond between fresh, wet concrete, and concrete previously set and dried. To obtain such restoration, removal and replacement of the old slab would be necessary. The fair and reasonable cost of such removal and replacement at the time defendant relinquished possession of the premises in question was $7,177.[9]
10. The cracks described in finding 7 were caused by over *300 loading the floor. Such overloading occurred during defendant’s occupancy.[10]
11. (a) In 1946, at the termination of the lease, the presence of the cracks indicated the possibility that a condition might develop, as a result of moisture entering the cracks, which would cause the floor to deteriorate further, and thereby to be unable to serve its purpose for the duration of what should have been its normal life at the time of its construction.
(ib) In 1954, at the time of the trial of this case, sufficient time had elapsed since the cracks appeared, and the floor had withstood sufficient usage without further deterioration, to indicate that the possibility of the floor not lasting out its normal life was, in 1946 as well as in 1954, remote.
(c) It is not established by the evidence that in 1946 the damage to the floor resulting from the overloading by defendant was such as to require removal and replacement of the slab to assure the floor lasting out the time which at the date of construction should have been its normal life.
(d) Repairs could have been made in 1946 which would have reduced substantially the possibility of further damage by moisture seepage into the cracks. Such repairs would not and could not have eliminated the damage, if any, that had already occurred as a result of such seepage.
(e) There is no evidence of the fair and reasonable cost of such repairs in 1946, other than defendant’s admission of liability in the amount of $1,000 as such cost.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States two thousand fifty three dollars and sixty-sis cents ($2,053.66).

 Plaintiff is a Florida corporation.

 The lease is in evidence as plaintiff’s exhibit 1, which is incorporated herein by reference.

 These items were alleged to be “in addition to the injuries to the floor * *

 This amount represents the sum of $1,053.66 and $7,687.00. The latter figure was the highest of three bids received by plaintiff for a new floor.

 This amount is the sum of $1,053.66 for “necessary items” and $1,000 for repair of the floor.

 Plaintiff, in other words, raises no issue concerning changes in the premises to which the language of paragraph 8 relating to alterations, fixtures, et cetera, would apply. Defendant, however, contends that such language is material to the proper interpretation of the further language of paragraph 8 relating to restoration.

 The lease contained no provision for inspection of the premises by the lessor during the lessee’s occupancy. Plaintiff relies on the evidence of the physical condition of the premises upon their return to it for proof that the floor was not then “* * * in the same condition as that existing at the time of entering * * * under this lease, reasonable and ordinary wear and tear * * * excepted.”

 Plaintiff further contends that the concession by defendant’s negotiating representatives of the need of the floor for repairs, and the admissions by defendant’s answer in relation thereto, amount in law to admission that the floor, at the time of the return of the property, was not in “* * * the same condition * * * reasonable and ordinary wear and tear * * * excepted * * *."

 Defendant has requested findings that “the floor cannot he restored to its original condition short of tearing out the floor and replacing it, since cracked concrete cannot be repaired,” and that “* * * replacing the floor would cost $7,177."

 As noted in finding 2 (a), tlie petition alleges that “* * * as a result of the overloading of the floor by the lessee, the floor was cracked to an extent that could not have been produced by shrinkage or expansion or contraction or * * * by damage by the elements * * The evidence in this case establishes that “as a result of the overloading of the floor by the lessee, the floor was cracked * * It does not establish that “* * * the floor was cracked to an extent that could not have been produced by shrinkage or expansion or contraction or * * * by damage by the elements.”